**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JEFFREY THOMPSON, derivatively on behalf of HUT 8 CORP.,

Plaintiff,

vs.

JAMIE LEVERTON, SHENIF VISRAM, JOSEPH FLINN, ASHER GENOOT, ALEXIA HEFTI, MICHAEL HO, STANLEY O'NEAL, RICK RICKERTSEN, MAYO A. SHATTUCK, III, BILL TAI, and AMY WILKINSON

Defendants,

and

HUT 8 CORP.,

Nominal Defendant.

Case No.: 1:24-cv-02542

**DEMAND FOR JURY TRIAL**

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Jeffrey Thompson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Hut 8 Corp., ("Hut 8" or the "Company"), files this Verified Shareholder Derivative Complaint against Jamie Leverton ("Leverton"), Shenif Visram ("Visram"), Joseph Flinn ("Flinn"), Asher Genoot ("Genoot"), Alexia Hefti ("Hefti"), Michael Ho ("Ho"), Stanley O'Neal ("O'Neal"), Rick Rickertsen ("Rickertsen"), Mayo A. Shattuck, III ("Shattuck"), Bill Tai ("Tai"), and Amy Wilkinson ("Wilkinson") (collectively, the "Individual Defendants," and together with Hut 8, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Hut 8, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities

Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hut 8, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from November 9, 2023 to January 18, 2024, both dates inclusive (the "Relevant Period").

2. Hut 8 is a cryptocurrency mining company that provides digital asset mining and high-performance computing infrastructure solutions in Canada. The Company claims to be a "leading innovator" and the "first company to operate computing infrastructure across sites that mines Bitcoin and delivers cloud, colocation, and high-performance computing services to our enterprise customers."

3. Founded in 2011, the Company was previously incorporated in British Columbia, Canada and operated as Hut 8 Mining Corp. ("Legacy Hut"). On November 30, 2023, Legacy Hut effected a strategic all-stock merger combining Legacy Hut and U.S. Data Mining Group, Inc. d/b/a US Bitcoin Corp. ("USBTC") (the "Merger"). As a result of the Merger, Hut 8 was formed

and each Legacy Hut shareholder received 0.2 shares of Hut 8 common stock, while each USBTC shareholder received 0.6716 shares of Hut 8 common stock.

4. Before the Merger, in December 2022, USBTC acquired a 50% interest in a joint venture bitcoin mining production facility in King Mountain, Texas (the "King Mountain Joint Venture"). As a result of the Merger, King Mountain Joint Venture became a part of the Company.

5. On January 18, 2024, the truth about the Merger was revealed when J Capital Research published an article titled "The Coming HUT Pump and Dump: Management hiding stock ownership through undisclosed related party, a stock-promoter cabal, and a host of left-for-dead assets" (the "J Capital Report"). The J Capital Report alleged, among other things, that the Merger was consummated on misstatements and omissions of material fact that failed to disclose that: (1) one of USBTC's biggest shareholders was an "undisclosed related party;" (2) USBTC's main asset and premier mining location, King Mountain Joint Venture, which became the property of Hut 8 by dint of the Merger, was not a financially stable asset since it "historically failed to provide energy and high-speed internet –unquestionably the two most important inputs for mining Bitcoin;" and (3) King Mountain Joint Venture had certain interest expenses that were not properly accounted for, making it appear as if King Mountain Joint Venture would be more profitable to Hut 8 than it actually was; and (4) according to an individual "highly familiar with USBTC," if not for the Merger, USBTC "would have done a structured bankruptcy."

6. On this news, the Company's stock price fell $2.16 per share, or 23.3%, from closing at $9.28 per share on January 17, 2024, to close at $7.12 per share on January 18, 2024, on abnormally high trading volume.

7. During the Relevant Period, the Individual Defendants breached their fiduciary duties throughout the Relevant Period by personally making and/or causing the Company to make

to the investing public a series of materially false and misleading statements regarding the Company's business, operation, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) one of USBTC's biggest shareholders was an "undisclosed related party;" (2) USBTC's main asset and premier mining location, King Mountain Joint Venture, which became the property of Hut 8 by dint of the Merger, was not a financially stable asset since it historically failed to provide energy and high-speed internet – core necessities for a data mining venture; (3) King Mountain Joint Venture had certain interest expenses that were not properly accounted for, making it appear as if King Mountain Joint Venture would be more profitable to Hut 8 than it actually was; (4) the profitability of certain USBTC assets was exaggerated; and (5) as a result, the Merger posed a significant risk to Hut 8's financial stability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8. The Individual Defendants also breached their fiduciary duties by failing to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls while two of the Individual Defendants engaged in improper insider sales, netting personal proceeds totaling $2,017,286.

10. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

11. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO"), to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's and CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. §§ 78j(b)), Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) and SEC Rule 10b-5 (17 C.F.R.

§ 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

18. Plaintiff is a current shareholder of Hut 8. Plaintiff has continuously held Hut 8 common stock since November 11, 2021.

**Nominal Defendant Hut 8**

19. Nominal Defendant Hut 8 is a Delaware corporation with its principal executive offices located at 1101 Brickell Avenue, Suite 1500, Miami, FL, 33131. Hut 8's shares trade on the NASDAQ under the ticker symbol "HUT."

**Defendant Leverton**

20. Defendant Leverton served as the Company's CEO from the Merger until her termination on February 6, 2024. Defendant Leverton also served as a Company director from the Merger until her termination on February 12, 2024. Previously, she had served as Legacy Hut's CEO from December 2020 until the Merger. According to the Form 4 the Company filed with the SEC on December 12, 2023, as of December 9, 2023, Defendant Leverton beneficially owned 337,233 shares of Hut 8 common stock. Given that the price per share of the Company's common

stock at the close of trading on December 8, 2023 was $10.25, Defendant Leverton owned approximately $3.5 million worth of Hut 8 stock as of that date.

21. According to Defendant Leverton's Employment Agreement, dated November 30, 2023, Defendant Leverton was entitled to receive $550,000 in total compensation from the Company for the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), made up entirely of her base salary. On February 12, 2024, Defendant Leverton and the Company entered into the Separation Agreement which entitles Defendant Leverton to a $1,100,000 cash payment and another cash payment of $500,000 in lieu of a bonus for the 2023 Fiscal Year.

22. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme were exposed, Defendant Leverton made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 12/22/2023 | 98,724 | $14.21 | $1,402,966 |
| 1/12/2024 | 35,761 | $10.10 | $361,257 |

Thus, in total, before the fraud was exposed, she sold 134,485 shares of Company stock on inside information, for which she received approximately $1,764,223 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the schemes.

23. The Company's prospectus filed on Form424B3 with the SEC on November 9, 2024 (the "Prospectus") in connection with the Merger stated the following about Defendant Leverton:

> ***Jamie Leverton***
> Ms. Leverton is currently Chief Executive Officer of Hut 8. Ms. Leverton is a highly accomplished technology executive and industry thought leader with a long history of driving high growth mandates. With more than 20 years of leadership in the Canadian technology industry, she joined Hut 8 from her role as the Chief Commercial Officer at eStruxture Data Centers. Her career also includes tenure as

the General Manager of Canada and APAC with data center and cloud provider Cogeco Peer 1 (now Aptum) and leadership roles with National Bank, BlackBerry, Bell Canada and IBM Canada. She proudly sits on the board of the Stratford Festival.

**Defendant Visram**

24. Defendant Visram has served as the Company's CFO since the Merger. Previously, he served as Legacy Hut's CFO from December 2022 until the Merger. According to the Form 4 the Company filed with the SEC on December 12, 2023, as of December 12, 2023, Defendant Visram beneficially owned 33,334 shares of Hut 8 common stock. Given that the price per share of the Company's common stock at the close of trading on December 12, 2023 was $8.43, Defendant Visram owned approximately $281,005 worth of Hut 8 stock as of that date.

25. According to Defendant Visram's Employment Agreement, dated November 30, 2023, Defendant Visram is entitled to receive $375,000 in total compensation from the Company, made up entirely of base salary.

26. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme were exposed, Defendant Visram made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| December 22, 2023 | 17, 897 | $14.14 | $253,063 |

Thus, in total, before the fraud was exposed, he sold 17,897 shares of Company stock on inside information, for which he received approximately $253,063 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

27. The Prospectus stated the following about Defendant Visram:

***Shenif Visram***

> Shenif Visram is currently the Chief Financial Officer of Hut 8. With over 20 years of experience leading world-class finance organizations, Shenif brings a breath of corporate and operational finance experience to Hut 8. He began his finance career at IBM Canada, where he progressed to the CFO roles in the largest IBM Canada Business units. He then moved to Cogeco Peer 1 as Vice President, Finance, where he jointly led the sale of the company to a private equity firm. He remained with the company post-sale and assumed the role of CFO, where he led the privatization of the company and played a key role in rebranding to Aptum Technologies. Shenif is a Charter Professional Accountant (CPA, CMA).

**Defendant Flinn**

28. Defendant Flinn has served as a Company director since the Merger. He also serves as Chair of the Audit Committee. Previously, he served as a director of Legacy Hut from August 2018 until the Merger. According to the Form 3 the Company filed with the SEC on December 6, 2023, as of November 30, 2023, Defendant Flinn beneficially owned 1,561 shares of Hut 8 common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Flinn owned approximately $14,830 worth of Hut 8 stock as of that date.

29. The Prospectus stated the following about Defendant Flinn:

> ***Joseph Flinn***
> Mr. Flinn has served as a director of Hut 8 since August 2018. He is the Chief Financial Officer of Seaboard Transportation Group, a major international bulk transportation group of companies. Prior thereto, Mr. Flinn held senior leadership positions at Sysco Corporation from 2008 to 2015, where he played an integral role as both Chief Financial Officer of Sysco Canada, and President of Sysco Canada's Eastern Division, and two years as President of Clarke Freight Transportation Group, a major national freight carrier. Mr. Flinn holds a business degree from Saint Mary's University and is a chartered professional accountant. Mr. Flinn is a member of the Institute of Corporate Directors and holds an ICD.D designation.

**Defendant Genoot**

30. Defendant Genoot has served as the Company's CEO since February 6, 2024. Previously, he had served as the Company's President from the Merger until February 6, 2024. Prior to that role, he co-founded USBTC with Defendant Ho in 2020 and served as USBTC's

Director and President until the Merger. According to the Form 4 the Company filed with the SEC on December 4, 2023, as of November 30, 2023, Defendant Genoot beneficially owned 3,044,408 shares of Hut 8's common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Genoot owned approximately $28,921,876 worth of Hut 8 stock as of that date.

31. According to Defendant Genoot's Employment Agreement, dated November 30, 2023, Defendant Genoot is entitled to receive $490,000 in total compensation from the Company, made up entirely of base salary.

32. The Prospectus stated the following about Defendant Genoot:

> ***Asher Genoot***
> Mr. Genoot has served as USBTC's President and as a Director since its inception and will serve as President and a director of New Hut. He has been a serial entrepreneur who started his first business, the Ivy Crest Institute of International Education, at the age of 19 in Shanghai, China and sold it shortly after. Following that experience, Mr. Genoot served as the founder and Chief Executive Officer at Curio, a Shanghai-based education company that expanded across the country from April 2016 to May 2019. He currently serves as a Board Member at Curio. He also has experience as the Managing Director at Flagship Endeavors, a brand incubator. Mr. Genoot graduated from the University of Southern California with a Bachelor's in Business Administration.

**Defendant Hefti**

33. Defendant Hefti has served as a Company director since the Merger. Defendant Hefti also serves as a member of the Nominating, Environmental, Social and Governance Committee. Previously, she served as a director of Legacy Hut from May 2021 until the Merger. According to the Form 3 the Company filed with the SEC on December 6, 2023, as of November 30, 2023, Defendant Hefti beneficially owned 16,564 shares of Hut 8's common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Hefti owned approximately $157,358 worth of Hut 8 stock as of that date.

34. The Prospectus stated the following about Defendant Hefti:

> ***Alexia Hefti***
> Ms. Hefti has served as a director of Hut 8 since May 2021. She serves as the Chief Executive Officer of eGovern.com, assisting governments in designing blockchain-enabled government services aimed at increasing citizenry engagement and governance, and as Special Advisor, Middle Eastern Affairs and Policy for the Government of Bermuda. She also serves as and Chairman of the Abed Group, a venture studio and private equity fund for blockchain regulatory technology companies. Ms. Hefti worked at Deloitte Middle East and Deloitte Canada, where she co-founded the blockchain and digital asset tax advisory practice. Ms. Hefti is a New York-qualified lawyer, and a graduate from McGill University (B.C.L/ LL.B) and the University of British Columbia (BA).

**Defendant Ho**

35. Defendant Ho has served as the Company's Chief Strategic Officer ("CSO") and as a Company director since the Merger. Prior to the Merger, Defendant Ho co-founded USBTC in 2020 with Defendant Genoot and served as USBTC's CEO and Chairman of the Board until the Merger. According to the Form 4 the Company filed with the SEC on December 4, 2023, as of November 30, 2023, Defendant Ho beneficially owned 6,326,412 shares of Hut 8 common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Ho owned approximately $60 million worth of Hut 8 stock as of that date.

36. According to Defendant Ho's Employment Agreement, dated November 30, 2023, Defendant Ho is entitled to receive $490,000 in total compensation from the Company, consistently entirely of base salary.

37. The Prospectus stated the following about Defendant Ho:

> ***Michael Ho***
> Mr. Ho has served as USBTC's Chief Executive Officer and as Chairman of the USBTC Board since its inception and will serve as Chief Strategy Officer and a director of New Hut. Mr. Ho has experience as a serial entrepreneur having founded numerous businesses in the digital and traditional trade sectors. He served as the CEO of Vancouver Motorcars Ltd. (formerly Advant Automotive Inc) from

January 2012 to April 2015. Mr. Ho then served as the CEO of MKH International Ltd, from July 2015 to December 2018. During this 6-year period, Mr. Ho specialized in currencies, international trade, structured financings and equity structuring. Mr. Ho also has extensive experience in the industry, having begun mining digital assets in 2014 and in 2017, Mr. Ho began setting up businesses procuring, managing, and selling turnkey digital asset mining facilities.

**Defendant O'Neal**

38. Defendant O'Neal has served as a Company director since the Merger. He also serves as a member of the Audit Committee. Prior to the Merger, he served as a USBTC director from April 2021 until the Merger. According to the Form 3 the Company filed with the SEC on December 5, 2023, as of November 30, 2023, Defendant O'Neal beneficially owned 211,039 shares of Hut 8 common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant O'Neal owned approximately $2 million worth of Hut 8 stock as of that date.

39. The Prospectus stated the following about Defendant O'Neal:

***Stanley O'Neal***
Mr. O'Neal has served as a director of USBTC since April 2021 and will serve as a director of New Hut. Mr. O'Neal is the former Chairman and Chief Executive Officer of Merrill Lynch. He became Merrill's chief executive in 2002 and was elected Chairman of Merrill Lynch in 2003, serving in both positions until October 2007. He also served as director of American Beacon Advisors, Inc. from 2009 to September 2012. Mr. O'Neal worked for Merrill Lynch for 21 years. He was named President and Chief Operating Officer in 2001 and before that was President of the brokerage firm's U.S. Private Client group. He served as Executive Vice President and Chief Financial Officer of Merrill Lynch from 1998 until 2000 and also held the position of Executive Vice President and Co-Head of the Corporate and Institutional Client Group for one year starting in 1997. Before joining Merrill Lynch, Mr. O'Neal was employed at General Motors Corporation where he held a number of financial positions of increasing responsibility, including General Assistant Treasurer. Mr. O'Neal received a Master's of Business Administration with distinction in Finance from Harvard University and is a graduate of Kettering University (formerly General Motors Institute). He served on General Motor's Board of Directors from 2001-2006 and also currently serves on the boards of Clearway Energy, Element Solutions, and Arconic Corporation.

**Defendant Rickertsen**

40. Defendant Rickertsen has served as a Company director since the Merger. He also serves as a member of the Compensation and Talent Development Committee. According to the Form 3 the Company filed with the SEC on December 6, 2023, as of November 30, 2023, Defendant Rickertsen beneficially owned 14,991 shares of Hut 8 common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Rickertsen owned approximately $142,414 worth of Hut 8 stock as of that date.

41. The Prospectus stated the following about Defendant Rickertsen:

> ***Carl J. Rickertsen***
> Mr. Rickertsen has served as a director of Hut 8 since December 2021. He is currently managing partner of Pine Creek Partners LLC a private equity investment firm, a position he has held since January 2004. From September 1994 to January 2004, Mr. Rickertsen was a managing partner at Thayer Capital Partners where he founded three private equity funds totaling over $1.4 billion. He has served as a member of the boards of directors and audit committees of Apollo Senior Floating Rate Fund Inc. and Apollo Tactical Income Fund Inc., each of which is a closed-end management investment company, since 2011 and 2013, respectively. Mr. Rickertsen has also served as a member of the board of directors and audit and compensation committees of Berry Global Inc., a global manufacturer and marketer of value-added plastic consumer packaging and engineered materials, since January 2013. From April 2012 to October 2016, Mr. Rickertsen was a member of the board of directors and compensation committee of Noranda Aluminum Holding Corporation, an integrated producer of value-added primary aluminum products and rolled aluminum coils. From April 2003 to January 2010, Mr. Rickertsen was a member of the board of directors and audit committee of Convera Corporation, a publicly-traded search-engine software company. From March 2004 to September 2008, Mr. Rickertsen was a member of the board of directors and compensation committee of UAP Holding Corp., a distributor of farm and agricultural products. Mr. Rickertsen received a B.S. from Stanford University and an M.B.A. from Harvard Business School. He is also a published author.

**Defendant Shattuck**

42. Defendant Shattuck has served as a Company director since the Merger. He also serves as the Chair of the Compensation and Talent Development Committee and as a member of the Audit Committee. Prior to the Merger, he served as a USBTC director from December 2021 until the Merger. According to the Form 3 the Company filed with the SEC on December 5, 2023,

as of November 30, 2023, Defendant Shattuck beneficially owned 54,903 shares of Hut 8 common stock. Given that the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Shattuck owned approximately $521,578 worth of Hut 8 stock as of that date.

43. The Prospectus stated the following about Defendant Shattuck:

> ***Mayo A. Shattuck III***
> Mr. Shattuck has served as a director of USBTC since December 2021 and will serve as a director of New Hut. He previously served as the Chairman of Exelon, a position he held from February 2012 to April 2022, and previously served as the Executive Chairman of the Board of Exelon from March 2012 through February 2013. Prior to its merger with Exelon, Mr. Shattuck was the Chairman, President and Chief Executive Officer of Constellation Energy, a position he held from October 2001 to February 2012. Constellation Energy owned energy-related businesses, including a wholesale and retail power marketing and merchant generation business. Mr. Shattuck was previously at Deutsche Bank, where he served as Chairman of the Board and CEO of Deutsche Banc Alex. Brown and as Global Head of Investment Banking and Global Head of Private Banking. While Chairman and CEO of Constellation Energy and Executive Chairman of Exelon, Mr. Shattuck served as Chairman of the Board of the Institute of Nuclear Power Operations and is a member of the Executive Committee of the Board of Edison Electric Institute and the Nuclear Energy Institute. He was also Co-Chairman of the Center for Strategic & International Studies Commission on Nuclear Policy in the United States and Executive Committee member of the Council on Competitiveness. Mr. Shattuck also currently serves on the Boards of Directors for Gap Inc. (since 2002) and Capital One Financial Corporation (since 2003). Mr. Shattuck has a Bachelor of Arts from Williams College and a Masters in Business Administration from The Stanford Graduate School of Business.

**Defendant Tai**

44. Defendant Tai has served as Chairman of the Board since the Merger. He also serves as a member of the Nominating, Environmental, Social and Governance Committee. Prior to the Merger, he had served as a director of Legacy Hut from March 2018 until the Merger. According to the Form 3 the Company filed with the SEC on December 6, 2023, as of November 30, 2023, Defendant Tai beneficially owned 137,857 shares of Hut 8 common stock. Given that

the price per share of the Company's common stock at the close of trading on November 30, 2023 was $9.50, Defendant Tai owned approximately $1.3 million worth of Hut 8 stock as of that date.

45. The Prospectus stated the following about Defendant Tai:

> ***Bill Tai***
> Mr. Tai has served as a director of Hut 8 since March 2018. He is a venture capitalist and was an early investor behind high profile start-ups including Canva, Color Genomics, Dapper Labs, Safety Culture, Tweetdeck, and Zoom Video. Previously, Mr. Tai co-founded several successful technology companies as Chairman including IPInfusion and Treasure Data Inc, and has served as a Director of seven publicly listed companies. He holds a Bachelor of Science in Electrical Engineering with Honors from the University of Illinois and an MBA from Harvard University.

**Defendant Wilkinson**

46. Defendant Wilkinson has served as a Company director since the Merger. She also serves as Chair of the Nominating, Environmental, Social and Governance Committee and as a member of the Compensation and Talent Development Committee. Prior to the Merger, she served as a director of USBTC from August 2022 until the Merger.

47. The Prospectus stated the following about Defendant Wilkinson:

> ***Amy Wilkinson***
> Ms. Wilkinson has served as a director of USBTC since August 2022 and will serve as a director of New Hut. She currently serves as the Chief Executive Officer of Ingenuity, an innovation consulting firm, a role she has held since founding the firm in January 2017. Ms. Wilkinson also serves as a Lecturer in Management at the Stanford Graduate School of Business, a role she has held since May 2015. Before joining the Stanford Graduate School of Business, Ms. Wilkinson was a Kauffman Foundation Grantee for Research on High Growth Entrepreneurs from 2013 to 2015 and a Senior Fellow at the Harvard Kennedy School of Government from 2009 to 2015. Ms. Wilkinson served in The White House as a White House Fellow and Special Assistant to the United States Trade Representative from 2004 to 2007. She also has experience as a strategy consultant at McKinsey & Company and as a mergers and acquisitions banker at JP Morgan. In addition to serving as a director of USBTC, Ms. Wilkinson currently serves on the Board of Directors for INNOVATE Corp. (since 2022). Ms. Wilkinson holds a Bachelor of Arts and Master of Arts from Stanford University and a Masters in Business Administration from the Stanford Graduate School of Business.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48. By reason of their positions as officers, directors, and/or fiduciaries of Hut 8 and because of their ability to control the business and corporate affairs of Hut 8, the Individual Defendants owed Hut 8 and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Hut 8 in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Hut 8 and its shareholders so as to benefit all shareholders equally.

49. Each director and officer of the Company owes to Hut 8 and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Hut 8, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51. To discharge their duties, the officers and directors of Hut 8 were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Hut 8, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual

Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Hut 8's Board at all relevant times.

53. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54. To discharge their duties, the officers and directors of Hut 8 were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Hut 8 were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Hut 8's own Code of Business Conduct and Ethics (the "Hut 8's Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Hut 8 conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Hut 8 and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Hut 8's operations would comply with all applicable laws and Hut 8's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55. Each of the Individual Defendants further owed to Hut 8 and the shareholders the duty of loyalty requiring that each favor Hut 8's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56. At all times relevant hereto, the Individual Defendants were the agents of each other and of Hut 8 and were at all times acting within the course and scope of such agency.

57. Because of their advisory, executive, managerial, directorial, and controlling positions with Hut 8, each of the Individual Defendants had access to adverse, non-public information about the Company.

58. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Hut 8.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance,

future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

61. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Hut 8 was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Hut 8 and was at all times acting within the course and scope of such agency.

## HUT 8'S CODE OF CONDUCT

64. Hut 8's Code of Conduct "sets basic requirements for business conduct and serves as a foundation for Company policies, procedures and guidelines, all of which provide additional guidance on expected behaviors. Specifically, the Code of Conduct was "designed to promote integrity and deter wrongdoing. The Company expects all representatives to adhere to the highest

ethical standards and uphold corporate values and principles, which include honesty, integrity and respect for others[.]"

65. Hut 8's Code of Conduct applies to "[e]very Company director, officer, employee and other personnel that the Company may determine should be subject to this Code of Business Conduct and Ethics, such as contractors or consultants (each a "**Covered Person**")[.]" (Emphasis on original.)

66. Under the heading "Consequences for Violations," the Code of Conduct provides that:

> Any violation of the Code of Business Conduct and Ethics, including fraudulent reports, may result in disciplinary action including termination of employment for cause or termination of service and, if warranted, legal proceedings. Violations include violation of the Code of Business Conduct and Ethics or another Company policy or procedure, violation of applicable laws, rules or regulations, deliberate failure to promptly report a violation or withhold relevant information concerning a violation, refusal to cooperate in the investigation of a known or suspected violation without valid legal reason or taking action against anyone who reports a violation or breach of any of the above.

67. Under the heading " Standards for Good Professional Ethics," the Code of Conduct provides:

> All of the Company's business activities and affairs must be carried out ethically and honestly. The Company expects all Covered Persons to conduct themselves with honesty and integrity and to avoid even the appearance of improper behavior. Anything less is unacceptable and may be treated as a serious breach of duty.

68. Under the heading "Ensure Financial Integrity," the Code of Conduct states the following, in relevant part:

> The Company is committed to the transparency and integrity of publicly filed financial reports and other communications. Covered Persons must do their part to ensure that the Company's public disclosure is full, fair, accurate, timely and understandable.
>
> Always act responsibly and exercise sound judgment regarding matters involving the Company's finances. Keep accurate, complete and timely records, and submit

> accurate and complete reports. Do not mislead, manipulate or improperly influence the Company's finance team or external auditors or make any false or misleading statements or omissions in the Company's public disclosure. Covered Persons should not personally enter into any side agreements or other informal arrangements, written or oral, related to the Company.

69. Under the heading, "Disclosure," the Code of Conduct states the following, in relevant part:

> It is the responsibility of every Covered Person to:
>
> i. recognize situations in which they have a conflict of interest, or might reasonably be seen by others to have a conflict
> ii. disclose that conflict in writing to management of the Company as soon as it is identified; and
> iii. take such further steps as may be appropriate to remedy the actual or perceived conflict of interest.
>
> Do not use the Company's opportunities, information or property for personal gain. Covered Persons are prohibited from competing with the Company, directly or indirectly, and owe a duty to the Company to advance the legitimate interests of the Company when the opportunity arises. Each Covered Person involved in the development of research, inventions, products or services that relate to the Company's existing or anticipated products, that relate to Company duties or that are developed using Company resources, are subject to the obligations set out in this Code of Business Conduct and Ethics.

70. Under the heading, "Comply with Laws," the Code of Conduct states the following, in relevant part:

> Always follow applicable laws, rules and regulations and do not engage in any type of illegal, unethical, fraudulent or corrupt business practices for any reason. The Company expects each Covered Person to understand the legal and regulatory requirements applicable to his or her business unit and areas of responsibility.
>
> ***Insider Trading***
> Covered Persons must comply with applicable insider trading laws, which generally prohibit buying or selling securities of the Company while in possession of material non-public information about the Company. See the Insider Trading Policy for more detail.

71. In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's

engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also, in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## HUT 8'S AUDIT COMMITTEE CHARTER

72. The Company also maintains an Audit Committee Charter (the "Audit Charter") which "sets forth the purpose, composition, authority and responsibility of the Audit Committee (the "Committee") of the Board. Specifically, the Audit Committee's purpose is to assist the Board in its oversight of:

- the quality and integrity of the Company's financial statements and related information, including the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
- the independence, qualifications, appointment and performance of the Company's external auditor (the "external auditor");
- the Company's disclosure controls and procedures, internal control over financial reporting, and management's responsibility for assessing and reporting on the effectiveness of such controls;
- the organization and performance of the Company's internal audit function;
- the Company's compliance with applicable legal and regulatory requirements; and
- the Company's enterprise risk management processes.

73. Regarding the Company's responsibilities with respect to Financial Reporting, the Audit Charter states that the Audit Committee shall have the following responsibilities and duties:

- Prepare an audit committee report to be included in the Company's annual proxy circular.

- Prior to their public disclosure, review and discuss with management and, if applicable, the external auditor or the internal auditor:

    i. the Company's annual financial statements and the related MD&A, including the discussion of critical accounting estimates under the Generally Accepted Accounting Principles ("GAAP") included therein and, if appropriate, recommend to the Board the approval, filing and disclosure of such information;

    ii. the Company's annual earnings press releases, including any pro forma or nonGAAP information included therein;

    iii. the Company's quarterly unaudited financial statements and associated MD&A, including the discussion of critical accounting estimates included therein;

    iv. the Company's quarterly earnings press releases, including any pro forma or nonGAAP information included therein;

    v. the type and presentation of financial information and earnings guidance provided to analysts, ratings agencies and others;

    vi. to the extent they include financial information extracted or derived from the Company's financial statements, other public reports or filings by the Company, including the Company's annual report on Form 10-K and proxy circular;

    vii. internal controls (or summaries thereof) and the integrity of the financial reporting and related attestations by the external auditor of the Company's internal control over financial reporting;

    viii. any significant difficulties encountered during the course of the audit, including, but not limited to, any restrictions on the scope of work or access to required information; and

    ix. the Company's guidelines and policies governing the process of risk assessment and risk management.

74. Under the heading "Financial Reporting Processes, Accounting Policies and Internal Controls," the Audit Charter states that the Audit Committee shall have the following responsibilities and duties:

- Review and discuss with management and the external auditor and internal auditor, and monitor, report and where appropriate, provide recommendations to the Board on:

  i. the adequacy and effectiveness of the Company's system of internal control over financial reporting, including any significant deficiencies and significant changes in internal controls;

  ii. the integrity of the Company's external financial reporting processes;

  iii. the Company's disclosure controls and procedures, including any significant deficiencies in or material non-compliance with, such controls and procedures; and

  iv. the relationship of the Committee with other committees of the Board and management.

- Understand the scope of the external auditors' review of internal control over financial reporting and obtain reports on significant findings and recommendations, together with management responses.

- Review and discuss with the Company's Chief Executive Officer (the "CEO") and CFO the process for the certifications to be provided and receive and review any disclosure from the CEO and CFO made in connection with the required certifications of the Company's quarterly and annual reports filed, including: (i) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

- Review major issues and analyses prepared by management or the external auditor or internal auditor regarding accounting principles and financial reporting issues and judgments made in connection with the preparation of financial statements, including any significant changes in the Company's selection or application of accounting principles, the effect of non-GAAP methods on the financial statements, complex or unusual transactions and highly judgmental areas, such as the presentation and impact of significant risks and uncertainties and key estimates and judgments of management that may be

material to financial reporting, the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

- Review and discuss with the independent auditors (outside of the presence of management) how the independent auditors plan to handle their responsibilities under the Private Securities Litigation Reform Act of 1995, and request assurance from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

- Discuss with the independent auditors those matters brought to the attention of the Committee by the independent auditors pursuant to Auditing Standard No. 1301, Communications with Audit Committees, as amended ("AS 1301").

- Based on the Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditors of the matters required to be discussed by AS 1301, and (3) with the independent auditors concerning the independent auditor's independence, the Committee shall make a recommendation to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K for the last fiscal year.

- Review and discuss with the independent auditors the report required to be delivered by such auditors pursuant to Section 10A(k) of the Exchange Act.

- Approve transactions between the Company and its officers, directors, principal shareholders and affiliates, in accordance with the terms of the Company's Code of Business Conduct and Ethics and Related Person Transactions Policy.
- Review the Company's policies and procedures for reviewing and approving or ratifying related-party transactions as set forth in the Related Person Transactions Policy.

- Review the Company's policies and procedures for monitoring compliance with the Code of Business Conduct and Ethics.

- Review the Company's procedures for reviewing reports of whistleblowing as set forth in the Whistleblower Policy.

- Review any reports of whistleblowing, including all reports made to the Company's anonymous and confidential helpline, with the Company's counsel in accordance with the Whistleblower Policy.

- Establish and oversee procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting

controls or auditing matters, including procedures for confidential, anonymous submissions by employees regarding questionable accounting or auditing matters.

- Meet periodically with management in the absence of the external auditor.

- Consider the risk of management's ability to override the Company's internal controls.

- At least annually, review, with the Company's legal counsel and accountants, all legal, tax, or regulatory matters that could have a significant impact on the Company's financial statements. Review the effectiveness of the system for monitoring compliance with laws and regulations and the results of management's investigation and follow-up of any instances of non-compliance. Receive and review periodic reports from the Company with respect to the Company's pending or threatened material litigation. Review the appropriateness of the disclosure thereof in the documents reviewed by the Committee.

- Discuss the Company's policies with respect to risk assessment and risk management, including cybersecurity, the Company's insurance and fidelity bond coverage, as well as the Company's major financial risk exposures, the steps management has undertaken to control them, and any reports of the internal auditor concerning such matters.

- Review the Company's compliance with internal policies and the Company's progress in remedying any material deficiencies that could have a significant impact on the Company.

- Review the findings of any examinations by regulatory agencies, and any external auditors observations made regarding those findings.

- Review the internal accounting department's budget and staffing.

- Establish systems for the regular reporting to the Committee by each of the Company's management, external auditors and internal accounting department of any significant judgments made by management in the preparation of the financial statements and the opinions of each as to appropriateness of such judgments.

75. In violation of the Audit Charter, the Individual Defendants (as key officers and members of the Company's Board) caused the Company to issue materially false and misleading statements to the public, facilitated and disguised the Individual Defendant's violations of law,

including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and aiding and abetting thereof. Also, in violation of the Audit Committee Charter, the Individual Defendants failed to implement risk assessment and risk management protocol and failed to ensure the Company's compliance with applicable law.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

76. Hut 8 is a cryptocurrency mining company that provides digital asset mining and high-performance computing infrastructure solutions in Canada. The Company claims to be a "leading innovator" and the "first company to operate computing infrastructure across sites that mines Bitcoin and delivers cloud, colocation, and high-performance computing services to our enterprise customers." Additionally, Hut 8 manages services, engages in energy arbitrage, and operates traditional data centers.

77. Before the Merger, in December 2022, USBTC acquired a 50% interest in King Mountain Joint Venture, a joint venture bitcoin mining production facility in King Mountain, Texas. King Mountain was previously owned by TZRC LLC ("TZRC"). For the three months ended September 30, 2023, the King Mountain Joint Venture posted self-mining revenue of $6.7 million, hosting services revenue of $13.3 million, and cost reimbursement revenue of $12.3 million.

78. On February 6, 2023, Legacy Hut and USBTC entered an agreement proposing an all-stock merger. On November 30, 2023, Legacy Hut and USBTC completed the Merger, whereby each Legacy Hut shareholder received 0.2 shares of Hut 8 common stock, while each USBTC shareholder received 0.6716 shares of Hut 8 common stock. On December 4, 2023, Hut

8 shares began trading on the NASDAQ. As a result of the Merger, King Mountain Joint Venture became a part of the Company.

79. During the Relevant Period, the Individual Defendants breached their fiduciary duties throughout the Relevant Period by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operation, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) one of USBTC's biggest shareholders was an "undisclosed related party;" (2) USBTC's main asset and premier mining location, King Mountain Joint Venture, which became the property of Hut 8 by dint of the Merger, was not a financially stable asset, since it historically failed to provide energy and high-speed internet – core necessities for a data mining venture; (3) King Mountain Joint Venture had certain interest expenses that were not properly accounted for, making it appear as if King Mountain Joint Venture would be more profitable to Hut 8 than it actually was; (4) the profitability of certain USBTC assets was exaggerated; and (5) as a result, the Merger posed a significant risk to Hut 8's financial stability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**False and Misleading Statements**

***November 9, 2023 Prospectus***

80. On November 9, 2023, the Company filed the Prospectus in connection with the Merger. Regarding USBTC, the Prospectus stated in relevant part:

> USBTC has several revenue streams: self-mining, hosting, managed infrastructure operations and equipment sales. Self-mining refers to all USBTC-owned machines that contribute computing power to mining pools in exchange for Bitcoin. Hosting refers to USBTC operating third party-owned machines at its sites in exchange for a hosting fee. Managed infrastructure operations refers to USBTC operating third-

> party-owned Bitcoin mining sites, leveraging its purpose-built site management software along with the curtailment platform, in exchange for a property management fee. Equipment sales refers to USBTC selling mining or infrastructure equipment to third-parties.
>
> USBTC owns and operates a Bitcoin mining facility in Niagara Falls, New York with access to approximately 50 MW of electricity (the "**Alpha Site**"). In December 2022, USBTC acquired from Compute North Member LLC ("**CN Member**") their entire membership interest in TZRC LLC, representing 50% of all issued and outstanding membership interests in the King Mountain JV with NextEra. The King Mountain JV owns a Bitcoin mining site in Upton County, Texas with access to approximately 280 MW of electricity (the "**Echo Site**"). The Echo Site is co-located behind-the-meter at a wind farm.
>
> (Emphasis in original.)

81. The Prospectus also detailed the energy output that would be available to the Company as a result of the Merger. Specifically, the Prospectus stated, in relevant part:

> Renewable energy sources powering USBTC's owned and operated sites include renewable energy and zero carbon emission energy from wind, hydro, and nuclear sources. As of June 30, 2023:
>
> - Alpha Site at Niagara Falls is fueled by a minimum of approximately 91% zero carbon emission energy sources;
> - Charlie Site in Nebraska is powered by more than 56% zero carbon emission sources, including 42.3% nuclear, 7.4% wind and 6.4% hydro; and
> - The Echo facility at King Mountain is co-located behind the meter at a wind farm, and at peak wind generation periods can draw up to 100% of the energy the wind project produces to power mining and hosting; the rest of the time, the energy is sourced from ERCOT which includes more than 40% zero carbon emission sources.

82. Under the heading "Risks Related to the Business Combination," the Prospectus described the risk of disruptions of Internet connection and the impact those disruptions could have on the Company's business. Specifically, the Prospectus stated the following:

> ***USBTC may face risks of Internet disruptions, which could have an adverse effect on the price of Bitcoin.***

> A ***disruption of the Internet may affect*** the use of Bitcoin and subsequently the value of USBTC's securities. Generally, Bitcoin and USBTC's business of mining digital assets is dependent upon the Internet. ***A significant disruption in Internet connectivity could disrupt a currency's network operations until the disruption is resolved and have an adverse effect*** on the price of Bitcoin and USBTC's ability to contribute computing power to pools that mine Bitcoin.

(Emphasis added.)

83. The Prospectus provided certain of USBTC's historical consolidated financial data for the year ended June 30, 2023. In particular, the Prospectus reported $82,160,000 in total revenue and a net loss of $65,611,000, or $1.52 per share.

***December 11, 2023 Press Release***

84. On December 11, 2023, Hut 8 issued a press release announcing the Company's "Operations Update for November 2023." The press release stated that as of November 2023, Hut 8 had: (1) a total energy capacity of 839 megawatts under management; (2) 207,399 total deployed miners under management; (3) 75,078 deployed miners self-mining; (4) 166,775 deployed miners under management for managed services, and (5) 76,737 deployed miners under management for hosting:

| | November 2023<br>Hut 8 Corp. | October 2023<br>Hut 8 Mining Corp. | October 2023<br>USBTC |
|---|---|---|---|
| Total energy capacity under management | **839 MW[1]** | 109 MW | 730 MW[1] |
| Total deployed miners under management | **207,399[2]** | 28,750 | 181,329[2] |
| Total hashrate under management | **21.6 EH/s[3]** | 2.6 EH/s | 18.6 EH/s[3] |
| **Self-Mining[4]** | | | |
| Deployed miners[5] | **75,078** | 28,750 | 46,225 |
| Deployed hashrate[6] | **7.3 EH/s** | 2.6 EH/s | 4.7 EH/s |
| Bitcoin produced | **390 BTC** | 112 BTC | 280 BTC |
| Bitcoin on balance sheet[7] | **9,129 BTC** | 9,113 BTC | 28 BTC |
| **Managed Services[8]** | | | |
| Energy capacity under management | **680 MW** | N / A | 680 MW |
| Deployed miners under management | **166,775** | N / A | 169,451 |
| Hashrate under management | **17.9 EH/s** | N / A | 17.6 EH/s |

| | | | |
|---|---|---|---|
| **Hosting** | | | |
| Deployed miners under management | **76,737** | N / A | 76,741 |
| Hashrate under management | **8.6 EH/s** | N / A | 8.0 EH/s |

***December 19, 2023 Form 10-Q***

85. On December 19, 2023, Hut 8 filed its quarterly report on Form 10-Q with the SEC for the third quarter ended September 30, 2023 (the "Q3 2023 10-Q"). The Q3 2023 10-Q reported the following about the King Mountain Joint Venture, in relevant part:

> On December 6, 2022, one of USBTC's subsidiaries acquired a 50% membership interest in the King Mountain JV and assumed the King Mountain JV's senior Note (the "King Mountain JV Senior Note"). USBTC acquired the 50% membership interest through a competitive auction process in connection with the Chapter 11 bankruptcy filing of Compute North. ***The King Mountain JV has self-mining and hosting operations at the King Mountain location. USBTC has concluded that the King Mountain JV will be accounted for with the equity method of accounting.*** USBTC's 50% portion of monthly distributions from the King Mountain JV will be swept to pay down the King Mountain JV Senior Note. For additional information on the King Mountain JV Senior Note, see below.
>
> Self-mining revenue, hosting services revenue and cost reimbursement revenues for the King Mountain JV was \$6.7 million, \$13.3 million and \$12.3 million, respectively, for the three months ended September 30, 2023, which represented 100% of the King Mountain JV's revenue during the period.

(Emphasis added.)

86. Under the heading "Related Party Transactions," the Q3 2023 10-Q stated:

> Related parties are defined as entities related to the Company's directors or main shareholders as well as equity method investment entities. ***The Company provides services to TZRC, an equity method investment entity*** (refer to Note 9 for additional information on the equity method investment entity), in exchange for fees under a PMA.

(Emphasis added.)

87. The Q3 2023 10-Q also provided a summarized consolidated income statement of TZRC (which is essentially King Mountain JV's income):

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

Condensed Consolidated Income Statement

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

Condensed Consolidated Balance Sheet

| | As of September 30, 2023 |
|---|---|
| Cash | $ 29,300 |
| Current assets | $ 41,022 |
| Noncurrent assets | $ 202,764 |
| Current liabilities | $ 26,371 |
| Noncurrent liabilities | $ 15,651 |
| Members' equity | $ 201,764 |

88. Under Note 10, the Q3 2023 10-Q provided a summary of TZRC (King Mountain Joint Venture's) promissory notes as of September 30, 2023 and June 30, 2023, respectively:

**Notes Payable – September 30, 2023:**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| ***Anchorage Loan*** | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 46,555 | $ 985 |
| ***TZRC Secured Promissory Note*** | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| ***Third Party Note*** | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | | Totals | $ 141,832 | $ 985 |

* = Net of debt issuance costs which totaled approximately $3.7 million.

**Notes Payable – June 30, 2023:**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| ***Anchorage Loan*** | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 48,587 | $ 1,299 |
| ***TZRC Secured Promissory Note*** | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 92,102 | — |

***January 5, 2024 Press Release***

89. On January 5, 2024, Hut 8 issued a press release announcing the Company's "Operations Update for December 2023." The press release stated that as of December 2023, the Company had: (1) a total energy capacity of 839 megawatts under management; (2) total deployed miners of 205,759 under management; (3) 73,943 deployed miners self-mining; (4) 166,347 deployed miners under management for managed services; and (5) 76,734 deployed miners under management for hosting.

| | December 2023 | November 2023 |
|---|---|---|
| Total energy capacity under management | **839 MW[1]** | 839 MW[1] |
| Total deployed miners under management | **205,759[2]** | 207,399[2] |
| Total hashrate under management | **21.5 EH/s[3]** | 21.6 EH/s[3] |
| **Self-Mining[4]** | | |
| Deployed miners[5] | **73,943** | 75,078 |
| Deployed hashrate[6] | **7.2 EH/s** | 7.3 EH/s |
| Bitcoin produced | **453 BTC** | 390 BTC |
| Bitcoin on balance sheet[7] | **9,195 BTC** | 9,129 BTC |
| **Managed Services[8]** | | |
| Energy capacity under management | **680 MW** | 680 MW |
| Deployed miners under management | **166,347** | 166,775 |
| Hashrate under management | **17.9 EH/s** | 17.9 EH/s |
| **Hosting** | | |
| Deployed miners under management | **76,734** | 76,737 |
| Hashrate under management | **8.6 EH/s** | 8.6 EH/s |

90. The statements in paragraphs ¶¶ 80-89 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) one of USBTC's biggest shareholders was an "undisclosed related party;" (2) USBTC's main asset and premier mining location, King Mountain Joint Venture, which became the property of Hut 8 by dint of the Merger, was not a financially stable asset, since it historically failed to provide energy and high-speed internet – core necessities for a data mining venture; (3) King Mountain Joint Venture had

certain interest expenses that were not properly accounted for, making it appear as if King Mountain Joint Venture would be more profitable to Hut 8 than it actually was; (4) the profitability of certain USBTC assets was exaggerated; and (5) as a result, the Merger posed a significant risk to Hut 8's financial stability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

***J Capital Report***

91. On January 18, 2024, the truth about the Merger was revealed when J Capital Research published J Capital Report. The J Capital Report revealed that Defendant Ho may be hiding ownership shares through his partner, Anna Kudrjasova ("Kudrjasova") who was a significant investor of USBTC through "her company," Anaya Capital Corp. As such, the J Capital Report stated that Anaya Capital Corp. appears to hold approximately 3.7 million USBTC shares, which is "particularly significant[] because Ho has committed to a lock-up of 65% of his shares – but not hers." Specifically, the J Capital Report revealed that:

> We believe he is hiding his true ownership through his life partner, a related party. Anna Kudrjasova, a significant investor in USBTC through "her company," Anaya Capital Corp., appears to be Michael Ho's personal partner and therefore may be hiding his interest in New Hut. This is particularly significant, because Ho has committed to a lock-up of 65% of his shares – but not hers. Anaya Capital appears to hold about 3.7 mln shares. **The only rationale we can see if Anaya is being used as a conduit is to dump shares quietly.**

(Emphasis on original.)

92. The J Capital Report further presented evidence that Defendant Ho and Kudrjasova are long-term associates, as they both listed the same address located in Dubai, United Arab Emirates ("UAE"). Specifically, the J Capital Report provided that:

> Documents for different companies list the same address for Ho and Kudrjasova, in Dubai at 5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671.

"(31) Anna Kudrjasova has sole voting and dispositive power over the securities held for the account of this selling stockholder, as director. **The selling stockholder's address is 5709 Cayan Tower, Dubai Marina, Dubai, UAE 643671.**"

"21 The address that Michael Ho gave as President, Secretary, and Treasurer of both Kairos and Ingenium Global Inc. – **5709 Cayan Tower in Dubai** – is different from the address he gave to the State of Florida in registering Prive."

The Hut 8 S-4 acknowledges that Kudrjasova lives in Dubai but lists her address as 1202, Al Barsha Heights, Teacom, Dubai Marina, Dubai, United Arab Emirates, a hotel and managed apartment property. Michael Ho's location is given as Dubai but without a street address. This suggests to us that Hut 8 management may be hiding the nature of their relationship.

(Emphasis on original.)

93. The J Capital Report also noted that the King Mountain Joint Venture "has historically failed to provide energy and high-speed internet—unquestionably the two most important inputs for mining Bitcoin." The J Capital Report expands upon this by stating, in relevant part:

***We are highly skeptical of the King Mountain JV accounts***. When USBTC paid about $105 mln for a 50% interest in this joint venture from TZRC LLC,44 King Mountain's owners were bankrupt and the JV without cash and only partially operational, according to bankruptcy filings.

On November 23, 2022, ***MARA, which was the largest customer for the King Mountain site, filed a motion stating that Compute North at King Mountain had failed to energize its miners and failed to provide an adequate internet connection.***

* * *

MARA also said that there was a lack of high-speed connection at the facility. We wonder how anyone is able to mine without energy and without high-speed internet.

* * *

***USBTC itself was so disgruntled that it filed suit. Just one month before buying the King Mountain JV, USBTC filed an action against CN King Mountain LLC for failing to find a location where miners could be installed and energized.***

* * *

Our diligence suggests that the facility now uses a Starlink satellite network instead of a broadband connection to access the internet. **This is unheard of in the Bitcoin mining industry**. Starlink is an expensive and unreliable choice for mining at scale. Said one interviewee who managed a large data center when asked if he would ever use Starlink as primary internet source for Bitcoin mining at scale, he said "never."

* * *

**King Mountain, TX JV ("Echo")**
The King Mountain JV has been plagued with connectivity problems. In its 2023 Annual Report, published on March 16, 2023, MARA reported "the company experienced significant production downtime in the second and third quarters . . . and delays in energization at King Mountain." MARA had 60,000 miners at the facility, but according to a Proof of Claim MARA filed in the Compute North bankruptcy case, the miners were never energized. MARA's Statement of Claim said that King Mountain lacked a high-speed internet connection.

(Emphasis added.)

94. The J Capital Report also highlighted that Hut 8 overstated its profitability by failing to consider "interest expenses" that it incurred in a specific period. Specifically, the J Capital Report stated that:

The company is misleading on the profitability of the JV, with accounts showing $665,000 of profit while completely ignoring about the $3.2 mln interest expense incurred during the same period.

**U.S. Data Mining Group, Inc. and Subsidiaries**
**Notes to Unaudited Condensed Consolidated Financial Statements**

A summarized consolidated income statement and balance sheet for TZRC as of September 30, 2023 follows:

Condensed Consolidated Income Statement

**An apparently, albeit barely, profitable JV seems like good news**

| | Three Months Ended September 30, 2023 |
|---|---|
| Revenues, net | $ 32,279 |
| Gross profit | $ 17,305 |
| Net income | $ 665 |
| Net income attributable to investee | $ 303 |

**Note 10. Notes Payable**

The following is a summary of the Company's secured promissory notes as of September 30, 2023 and June 30, 2023:

**Notes Payable – September 30, 2023:**

**Yet these JV numbers exclude the very expensive interest cost from a promissory note assumed with the acquisition of the JV - this cost is shown elsewhere in the company filings**

| Issuance Date | Maturity Date | Interest Rate | Principal * | Current Portion |
|---|---|---|---|---|
| *Anchorage Loan* | | | | |
| February 3, 2023 | February 2, 2028 | 14.00 % | $ 46,555 | $ 985 |
| | | | | |
| *TZRC Secured Promissory Note* | | | | |
| December 6, 2022 | April 8, 2027 | 15.25 % | 84,292 | — |
| | | | | |
| *Third Party Note* | | | | |
| December 6, 2022 | December 5, 2027 | 18.0 % | 10,985 | — |
| | | Totals | $ 141,832 | $ 985 |

* = Net of debt issuance costs which totaled approximately $3.7 million.

95. The J Capital Report further disputed the figures that Hut 8 provided in its monthly Operations Updates, especially regarding the number of miners that Hut 8 employs. Specifically, the J Capital Report stated, in relevant part:

> We are confused about how many miners USBTC has. The November 2023 Hut 8 operations update claims that USBTC had 46,225 Bitcoin miners deployed for October 2023, and yet at the end of September 2023, USBTC reported operating only 30,200 miners.
>
> We find this ramp-up extremely unlikely, especially without disclosing new machine orders or deposits for new miners in USBTC's end September 2023

> balance sheet. Remaining construction in progress was far less than the typical purchase value for that many extra machines. Is USBTC telling the truth?

96. The J Capital Report also identified an individual who was "highly familiar" with USBTC and maintained that without the Merger, USBTC would have initiated a structured bankruptcy. Specifically, the J Capital Report provided that:

> One person highly familiar with USBTC told us, **"without the merger, [USBTC] would have done a structured bankruptcy."** Why then did HUT pay $745 mln to acquire this company and its planned payments? Even worse, we estimate a value for USBTC that's as much as 70% less. Typically, such egregious over-payments occur only when management is being enriched[.]

97. Under the heading "Is Hut 8 the biggest dupe on the exchange? Or did it collude with its merger partner? If Hut 8 had waited one month, USBTC might have been bankrupt," the J Capital Report stated that:

> "**The merger was a complete godsend for USBTC**," someone deeply involved with the company told us. Without the merger, this person said, ***USBTC would have been bankrupt within weeks.*** **"It was very much in the cards**."
>
> **In early 2023, USBTC gave up almost half its miners, plus $20.7 mln and some other assets, in an apparent default.**
>
> Our interviewee said that USBTC "begged" NYDIG to forgive the loan but soon after Christmas was forced to surrender assets. Hut 8 managed to characterize this default as a $23.7 mln **GAIN** on debt extinguishment. But it had started out as a $24.2 mln **LOSS** that the company "fixed" through an accounting sleight of hand. Abracadabra!
>
> (Emphasis on original.)

98. The J Capital Report concluded by discussing the value of USBTC at the time of the Merger and Hut 8's potential overpayment by stating that "we estimate a value for USBTC that's as much as 70% less. Typically, such egregious over-payments occur only when management is being enriched." Further the J Capital Report provided that:

> **We are highly skeptical that the King Mountain JV is worth the $105** mln paid by USBTC, given reports that the center at the time lacked both reliable power and

> internet. Nevertheless, we assign what we believe to be an aggressive $105 mln valuation – the price USBTC paid for the facility. This is despite MARA's recent purchase of Granbury and Kearney, which indicates that the King Mountain JV would be worth only $64 mln.
>
> **Our valuation of USBTC's Managed Infrastructure Operations (MIO) business is $51 mln, a generous 3x forward revenue.**
>
> * * *
>
> In total, we value the USBTC operating assets at the high end at $219 mln. **Not only do we suspect that USBTC overpaid for the King Mountain JV, but Hut 8 overpaid again, by a factor of four, for the same facility, along with the Niagara mining facility and the two managed-facility contracts.** New Hut issued 49.7 mln shares in exchange for all USBTC stock – a value of about $495 mln at the time. Hut 8 also took on $160 mln in net debt plus around $90 mln in planned spending commitments ($40 mln for AI equipment and $50 mln in planned capital expenditure) in exchange for the USBTC and Old Hut assets.

(Emphasis on original.)

99. On this news, the Company's stock price fell $2.16 per share, or 23.3%, from closing at $9.28 per share on January 17, 2024 to close at $7.12 per share on January 18, 2024, on abnormally high trading volume.

## DAMAGE TO HUT 8

100. As a direct and proximate result of the Individual Defendants' conduct, Hut 8 has lost and will continue to lose and expend many millions of dollars.

101. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

102. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

103. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

104. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

105. As a direct and proximate result of the Individual Defendants' conduct, Hut 8 has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

106. Plaintiff brings this action derivatively and for the benefit of Hut 8 to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Hut 8, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, as well as for contribution under Section 10(b) and 21D of the Exchange Act.

107. Hut 8 is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108. Plaintiff is, and has been at all relevant times, a shareholder of Hut 8. Plaintiff will adequately and fairly represent the interests of Hut 8 in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

109. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

110. A pre-suit demand on the Board of Hut 8 is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Tai, Ho, Genoot, Hefti, Flinn, Shattuck, O'Neal, Wilkinson, and Rickertsen (the "Director Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of this complaint.

111. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

112. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Hut 8 to make the materially false and misleading statements alleged herein. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

113. Additional reasons that demand on Defendant Tai is futile follow. Defendant Tai is the Company's Chairman of the Board, and is a member of the Nominating, Environmental, Social and Governance Committee. As a trusted Company director, he conducted little, if any, oversight

of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Tai breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114. Additional reasons that demand on Defendant Ho is futile follow. Defendant Ho has served as a Company director and as the Company's CSO at all relevant times. Defendant Ho has received and continues to receive compensation for his role as a director and as CSO as described above. Thus, he is a non-independent director. As a trusted Company director and as the Company's trusted CSO, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, he co-founded USBTC with Defendant Genoot, whom he shares extensive professional and personal relationships with. For these reasons, Defendant Ho breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

115. Additional reasons that demand on Defendant Genoot is futile follow. Defendant Genoot has served as the Company's CEO since February 6, 2024, when Defendant Leverton was terminated from that position. He has served as a Company director at all relevant times and continues to serve as a Company director while CEO. Thus, he is a non-independent director. Defendant Genoot has received and continues to receive compensation for his role as a director as described above. As a trusted Company director and the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, he co-founded USBTC with Defendant Ho, whom he shares extensive professional and personal relationships with. For these reasons, Defendant Genoot breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

116. Additional reasons that demand on Defendant Hefti is futile follow. Defendant Hefti has served as a Company director at all relevant times. Defendant Hefti also serves as a member of the Nominating, Environmental, Social and Governance Committee. Defendant Hefti has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Hefti breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

117. Additional reasons that demand on Defendant Flinn is futile follow. Defendant Flinn has served as a Company director at all relevant times. Defendant Flinn also serves as Chair of the Audit Committee. Defendant Flinn has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons,

Defendant Flinn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

118. Additional reasons that demand on Defendant Shattuck is futile follow. Defendant Shattuck has served as a Company director at all relevant times. He also serves as Chair of the Compensation and Talent Development Committee and as a member of the Audit Committee. Defendant Shattuck has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Shattuck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

119. Additional reasons that demand on Defendant O'Neal is futile follow. Defendant O'Neal has served as a Company director at all relevant times. He also serves as a member of the Audit Committee. Defendant O'Neal has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant O'Neal breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

120. Additional reasons that demand on Defendant Wilkinson is futile follow. Defendant Wilkinson has served as a Company director at all relevant times. He also serves as a member of

the Nominating, Environmental, Social, and Governance Committee. Additionally, Defendant Wilkinson has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Wilksinson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

121. Additional reasons that demand on Defendant Rickertsen is futile follow. Defendant Rickertsen has served as a Company director at all relevant times. He also serves as a member of the Compensation and Talent Development Committee. Additionally, Defendant Rickertsen has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rickertsen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

122. Additional reasons that demand on the Board is futile follow.

123. Defendants Flinn, O'Neal and Shattuck served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Flinn, O'Neal, and Shattuck failed to adequately review and discuss the Company's Q3 2023 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure

adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and failed to follow the Audit Committee Charter and the Code of Conduct. Thus, Defendants Flinn, O'Neal and Shattuck further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

124. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause Hut 8 to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Conduct, the Director Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

125. Hut 8 has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Hut 8 any part of the damages Hut 8 suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

126. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

127. The acts complained of herein constitute violations of fiduciary duties owed by Hut 8's officers and directors, and these acts are incapable of ratification.

128. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Hut 8. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Hut 8, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

129. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Hut 8 to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

130. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Breach of Fiduciary Duties**

131. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

132. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Hut 8's business and affairs.

133. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

134. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Hut 8.

135. In breach of their fiduciary duties owed to Hut 8, the Individual Defendants willfully or recklessly caused the Company to engage in improper cybersecurity practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) one of USBTC's biggest shareholders was an "undisclosed related party;" (2) USBTC's main asset and premier mining location, King Mountain Joint Venture, which became the property of Hut 8 by dint of the Merger, was not a financially stable asset, since it historically failed to provide energy and high-speed internet – core necessities for a data mining venture; (3) King Mountain Joint Venture had certain interest expenses that were not properly accounted for, making it appear as if King Mountain Joint Venture would be more

profitable to Hut 8 than it actually was; (4) the profitability of certain USBTC assets was exaggerated; and (5) as a result, the Merger posed a significant risk to Hut 8's financial stability. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

136. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

137. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

138. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements while two of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $2 million dollars.

139. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Hut 8's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

140. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Hut 8 has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142. Plaintiff on behalf of Hut 8 has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

143. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

144. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Hut 8.

145. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Hut 8 that was tied to the performance or artificially inflated valuation of Hut 8, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

146. Plaintiff, as a shareholder and a representative of Hut 8, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

147. Plaintiff on behalf of Hut 8 has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Abuse of Control

148. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

149. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Hut 8, for which they are legally responsible.

150. As a direct and proximate result of the Individual Defendants' abuse of control, Hut 8 has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Hut 8 has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151. Plaintiff on behalf of Hut 8 has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Gross Mismanagement

152. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

153. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Hut 8 in a manner consistent with the operations of a publicly-held corporation.

154. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Hut 8 has sustained and will continue to sustain significant damages.

155. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

156. Plaintiff on behalf of Hut 8 has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

157. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

159. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Hut 8 to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

160. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

161. Plaintiff on behalf of Hut 8 has no adequate remedy at law.

## SIXTH CLAIM

### Against Defendants Leverton and Visram for Contribution Under Sections 10(b) and 21D of the Exchange Act

162. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163. Hut 8, Defendant Leverton, and Defendant Visram are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of

Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Leverton's and Visram's willful and/or reckless violations of their obligations as officers and/or directors of Hut 8.

164. Defendants Leverton and Visram, because of their positions of control and authority as officers and/or directors of Hut 8, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Hut 8, including the wrongful acts complained of herein and in the Securities Class Action.

165. Accordingly, Defendants Leverton and Visram are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

166. As such, Hut 8 is entitled to receive all appropriate contribution or indemnification from Defendants Leverton and Visram.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Hut 8, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Hut 8;

(c) Determining and awarding to Hut 8 the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally,

together with pre-judgment and post-judgment interest thereon;

(d) Directing Hut 8 and the Individual Defendants to take all necessary actions to reform and improve Hut 8's corporate governance and internal procedures to comply with applicable laws and to protect Hut 8 and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Hut 8 to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Hut 8 restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 3, 2024 **THE BROWN LAW FIRM, P.C.**

*/s/ _Timothy Brown______*

Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Jeffrey Thompson, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29 day of March, 2024.

DocuSigned by:
JEFFREY THOMPSON
3FA3A30777EF45F...

Jeffrey Thompson